# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3688
_____

United States of America

*Plaintiff - Appellee*

v.

Kerry Bernard Morgan, Jr.

*Defendant - Appellant*

_____

No. 21-3778
_____

United States of America

*Plaintiff - Appellee*

v.

Jarad Paul Postell

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Southern District of Iowa - Eastern

_____

Submitted: September 23, 2022
Filed: December 1, 2022
[Unpublished]
_____

Before COLLOTON, WOLLMAN, and STRAS, Circuit Judges.
_____

PER CURIAM.

K.M. died of a drug overdose on September 11, 2019. Kerry Bernard Morgan, Jr., and Jarad Paul Postell were found guilty of conspiracy to distribute fentanyl resulting in K.M.'s death. In this consolidated appeal, they argue that the district court[1] erred in denying their motion for judgment of acquittal, claiming that the government failed to prove that fentanyl caused K.M.'s death. We affirm.

Postell and Eric Stoltenberg met K.M. and her friend at a park near Davenport, Iowa, on the evening of September 10, 2019. K.M. and her friend asked for a ride to the drug rehabilitation facility from which they had recently been involuntarily discharged. Postell allowed K.M. to drive his vehicle to the facility, which refused to readmit K.M. but allowed her friend to return.

K.M., who had just met Postell and Stoltenberg, used methamphetamine with them that night, following which, at K.M.'s request, Postell made arrangements to purchase heroin. Amber Maxwell distributed to Postell 0.1 grams of a drug that she had purchased from Morgan and that she believed to be heroin, which Postell then gave to K.M. Later testing revealed that the drug was fentanyl.

---

[1]The Honorable John A. Jarvey, then Chief Judge, United States District Court for the Southern District of Iowa, now retired.

K.M. snorted a line of the drug sometime between 1:43 a.m. and 2:19 a.m. on September 11, 2019. She said that it was strong, soon began nodding off, and eventually became unconscious. With K.M. still in his vehicle, Postell drove to a casino and then to a Wal-Mart. By the time they arrived at Wal-Mart (approximately 3:00 a.m.), K.M.'s condition had deteriorated to the point that she did not wake up when Postell threw a cold drink on her.

Postell did not take K.M. to the hospital, but instead called Maxwell, who asked Morgan for Narcan, a drug used to treat opioid overdoses. Postell, Maxwell, and Morgan agreed to meet at a gas station. Surveillance video showed that Maxwell arrived at 3:16 a.m. She brought a friend who knew how to administer Narcan. Postell arrived with K.M. at 3:20 a.m. Maxwell approached the passenger's side of Postell's vehicle and assessed K.M., who was not breathing and did not have a pulse. K.M.'s complexion was white, her lips were blue, and she felt cold. Maxwell believed that K.M. was already dead.

Morgan arrived with Narcan at 3:24 a.m. Maxwell's friend administered the Narcan, even though he, too, believed that K.M. was deceased. K.M. did not respond.

Postell brought K.M. to the hospital at 3:32 a.m., telling nurses that he did not know who she was and did not know what drugs she had taken. Hospital staff administered Narcan, along with other treatments, but K.M. remained nonresponsive and was declared dead at 4:05 a.m. According to the toxicology report, K.M.'s femoral blood contained 1,900 ng/ml of methamphetamine and 18 ng/ml of fentanyl.

A superseding indictment set forth the conspiracy charge against Morgan, Postell, and Maxwell, alleging, among other things, that the conspiracy involved fentanyl purported to be heroin in violation of 21 U.S.C. § 841(a)(1) and that death and serious bodily injury resulted from the use of the fentanyl in violation of 21 U.S.C. § 841(b)(1)(C). Maxwell pleaded guilty. Morgan and Postell stipulated that

they had participated in a conspiracy to distribute controlled substances and proceeded to trial on the question whether the fentanyl they distributed caused K.M.'s death.

Morgan and Postell moved for judgment of acquittal at the close of the government's evidence and again at the close of all evidence. The district court took the motion under advisement. The jury found Morgan and Postell guilty, specifically finding that the fentanyl they had distributed resulted in K.M.'s death. The district court thereafter denied the motion and entered judgment.

We review *de novo* the denial of the motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict. United States v. Broeker, 27 F.4th 1331, 1335 (8th Cir. 2022). Section 841(b)(1)(C) provides for enhanced penalties "if death or serious bodily injury results from" the use of controlled substances distributed by a defendant. The term "results from" requires "that the drug be either the 'but-for' cause or an 'independently sufficient' cause of the injury." United States v. Cathey, 997 F.3d 827, 832 (8th Cir. 2021) (quoting Burrage v. United States, 571 U.S. 204, 218–19 (2014)).

We conclude that the evidence was sufficient to support a finding that fentanyl caused K.M.'s death. Expert witnesses testified that fentanyl is a central nervous system depressant that causes respiratory depression, low blood pressure, and low heart rate. Respiratory depression can lead to irregular breathing, lack of oxygen, increased carbon dioxide in the blood, and, eventually, loss of consciousness and cardiopulmonary arrest. After consuming fentanyl, which is far more potent than heroin, a user might nod off or seem lethargic and sleepy. Narcan is administered after an opioid overdose because it reverses the effect of the drug.

-4-

Witnesses testified that K.M. nodded off soon after she consumed the fentanyl and that she thereafter became nonresponsive.  Maxwell asked Morgan for Narcan after learning about K.M.'s state "[b]ecause that's what brings you back after a heroin overdose."  The evidence indicates that everyone who encountered K.M. in those early morning hours—all experienced drug users—believed that K.M. had overdosed on heroin.

The autopsy report stated that K.M.'s cause of death was acute mixed-drug intoxication, noting that fentanyl, acetyl fentanyl, methamphetamine, and benzodiazepines were found in K.M.'s femoral blood.  The report further stated that pulmonary and cerebral edema were present, which forensic toxicologist Donna Papsun identified as "classic signs at autopsy" of an opiate overdose.  Papsun further testified that the amount of fentanyl in K.M.'s system was substantial and could be fatal, depending on factors like K.M.'s opioid tolerance.

The record does not set forth the extent of K.M.'s prior opioid use or tolerance, but it establishes that she had recently spent two months in a drug rehabilitation facility.  The autopsy report noted that "[i]t is not unusual" for opiate users to lose their tolerance "upon entering an abstinent environment, such as rehabilitation." Similarly, Maxwell testified that, in her experience, users build up a tolerance and that "it's very easy to overdose" when opioids are first used or "when you first got out of prison or when you start using again after not using."  The friend who returned to the facility the night of K.M.'s death testified that he knew K.M. to be a methamphetamine user, not an opioid user.  A fair inference from the evidence is that K.M. had a low tolerance for opioids.

In support of their argument that the evidence was insufficient, Morgan and Postell point out that the government did not present an expert witness to testify to the cause of death.  They cite evidence that postmortem redistribution might have rendered inaccurate the fentanyl concentration in K.M.'s femoral blood, particularly

because of the four-day lapse between K.M.'s death and the autopsy. They argue that K.M. had a potentially fatal amount of methamphetamine in her system and that K.M. may have sought out opioids to lessen her methamphetamine high. They also rely on their expert's opinion that K.M. died of a methamphetamine overdose, which was based on the facts that K.M.'s pupils were dilated and that she did not react to Narcan.

Against this evidence, the jury considered the substantial evidence that fentanyl caused K.M.'s death, including that K.M. did not exhibit the symptoms of a methamphetamine overdose, that she instead exhibited the symptoms of a fentanyl overdose, that she lost consciousness shortly after taking the fentanyl, that her pupils may have been dilated because her brain had been deprived of oxygen for a period of time, that she did not react to the Narcan because she was already deceased when it was administered, and that—even accounting for postmortem redistribution—the concentration of fentanyl in her system could be deadly, particularly if she had a low tolerance for opioids. See United States v. Parker, 993 F.3d 595, 606 (8th Cir. 2021) ("Although the medical examiner testified that E.M.'s cause of death was a mixed toxicity involving cocaine, ethanol, and heroin, there was sufficient evidence for the jury to conclude that the heroin Parker gave E.M. was an independently sufficient cause of her death because she immediately lost consciousness after taking it, still had 6-MAM in her blood, and heroin was present at a fatal level." (footnote omitted)). The evidence presented at trial merely "created a factual issue for the jury to resolve rather than an absolute legal bar to conviction." United States v. Seals, 915 F.3d 1203, 1206 (8th Cir. 2019); see id. ("Although the evidence must be consistent with guilt, it need not be inconsistent with every other reasonable hypothesis." (alteration omitted) (quoting Klein v. United States, 728 F.2d 1074, 1075 (8th Cir. 1984) (per curiam)).

We conclude that a jury could find beyond a reasonable doubt that fentanyl was the but-for cause or an independently sufficient cause of K.M.'s death.  The judgment is affirmed.

_____